**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 22, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

ROY C. JOHNSON,

      Plaintiff-Appellant,

v.

CITY OF TULSA, OKLAHOMA,

      Defendant-Appellee.

No. 05-5122
(D.C. No. 02-CV-826-M)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **TYMKOVICH**, Circuit Judges.

Plaintiff Roy Johnson appeals the adverse judgment of the district court entered on a jury verdict in his employment discrimination and civil rights lawsuit. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

## I. Procedural History

Roy Johnson is an African-American who began working as a police officer for the Tulsa Police Department (TPD) in 1976. In 1994, he filed a complaint against the City of Tulsa (City) alleging racial discrimination in employment. That action was certified as a class action in 1998. In December 2001, the district court stayed the case to facilitate settlement. In April 2002 and again in December 2002, the parties filed proposed consent decrees with the district court. The district court ultimately approved the second consent decree, a decision that we affirmed in *Johnson v. Lodge #93 of Fraternal Order of Police*, 393 F.3d 1096 (10th Cir. 2004).

On February 22, 2002, while the class action was stayed, the City terminated Johnson's employment. Johnson then filed this lawsuit, alleging that his discharge was because of his race and in retaliation for his role in the class action in violation of 42 U.S.C. §§ 1981, 1983, and 1985; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17; and Oklahoma law. His theory of the case was that a conspiracy existed among various TPD personnel to fabricate a reason to discharge him because of his role in the class action lawsuit. The alleged conspiracy included (1) imposing remedial measures related to his DUI enforcement activities, (2) fabricating documentation showing that he failed to comply with those measures, and (3) soliciting false complaints against him.

The case was tried to a jury. The jury found that, although race was not a motivating factor, the City's discharge of Johnson was motivated by retaliation for having filed his earlier lawsuit but that the City would have terminated his employment even in the absence of the retaliatory motive. Johnson filed a post-trial motion for judgment as a matter of law (JMOL) under Fed. R. Civ. P. 50(b), arguing that there was insufficient evidence to support the City's "mixed-motive" defense. The district court denied the Rule 50(b) motion. The district court also denied Johnson's motion for a new trial in which he argued that the court improperly instructed the jury as to the nature of the employment relationship between the parties. This appeal followed.

## II. Background[1]

During Johnson's twenty-five years of service with the TPD, he received eighteen letters of commendation and was given awards in 1995, 1999, and 2000 for arresting a high number of drunk drivers. In October 2000, Sergeant Kirk Hewitt wrote an internal TPD memorandum in which he expressed concern about Johnson's performance. Hewitt was not Johnson's supervising sergeant but worked a shift that overlapped with Johnson's. Among other things, Hewitt

---

[1]     Because Johnson does not challenge the jury finding that race was not a motivating factor, we will focus only on his retaliation claim. The background facts are relevant to whether there was sufficient evidence to support the City's mixed-motive defense; therefore, we view the evidence in the light most favorable to the City and draw all reasonable inferences from it in the City's favor. *See Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1123 (10th Cir. 2002).

described a number of DWI or DUI arrests Johnson had made in which the suspect's breath test was below the legal limit for blood alcohol content (BAC). Johnson's supervising sergeant, Ed Pierce, who previously had required Johnson to videotape all of his traffic stops to assist in responding to citizen complaints about Johnson, conducted an investigation of Hewitt's allegations. He independently examined seventy-six of Johnson's DUI arrests and found that twenty-nine of them, or 36%, resulted in a breath test below the legal limit, although many of the suspects who tested low were arrested on other charges. He found that, department-wide, 211 out of 1,639, or 13%, of DUI arrestees tested below the legal limit. He also noted that several of Johnson's low test results had generated written and verbal complaints to the TPD. Among other things, Pierce recommended that Johnson review the standard field sobriety tests (SFSTs) and provide more detail in his arrest reports.

As a result of Pierce's report, Johnson's superior officers, Major Sidney Merchant and Captain Mark McCrory, implemented a variety of remedial measures in December 2000. Those measures included that Johnson receive SFST training to refresh the training he had received in 1994. To this end, Johnson took an SFST class in March 2001, and in July 2001 he went to a multi-day SFST course. The remedial measures also required Johnson to provide his supervisors with a memo every time the result of a breath test he gave to a suspect was below the legal limit. Seventeen such memos were discussed at trial,

many indicating that, prior to arresting the suspect, Johnson had given only one of the SFSTs, the horizontal gaze nystagmus (HGN) test, instead of all three SFSTs.[2] On May 31, 2001, Merchant imposed additional remedial measures on Johnson: that he bring all DUI test subjects to the Uniform Division Southwest station for chemical testing, that he acquire another officer to conduct the testing, and that he have a supervisor approve any DUI arrest prior to transporting the suspect to the detention center.

Meanwhile, on May 5, 2001, Johnson pulled over Grady Maples for speeding and running a red light. Approximately six minutes before, Maples had left work at a local hospital where he had been assisting in the operating room as a surgical nurse. After Johnson observed that Maples was unsteady on his feet, slightly slurred his speech, and sweated profusely while sitting in Johnson's air-conditioned patrol car, Johnson administered the HGN test and obtained a lack of smooth pursuit.[3] He then arrested Maples and took him in for a breath test,

---

[2]    The other two SFSTs are known as the one-legged stand and the nine-step walk and turn.

[3]    The HGN test requires the suspect to follow a pen or other object as it is moved laterally in front of the suspect's eyes. Persons under the influence of alcohol or some depressant drugs have difficulty pursuing the pen without their eyes jerking (nystagmus), which is referred to as lack of smooth pursuit. A lack of smooth pursuit can yield two of six possible clues on the HGN test, one for each eye. A person under the influence also may exhibit nystagmus when the pen is moved to a forty-five degree angle and when the eyes are held at maximum deviation, each of which can yield two more clues per eye. The TPD instructs its officers to test for all six clues.

which was 0.00% BAC. Maples then agreed to a take blood test. The blood was drawn but Johnson never requested a lab test of the sample. Johnson booked Maples into jail on a charge of DUI-drugs, gave him a traffic citation, and released him.

The next day, Maples' sister-in-law called the TPD to complain about the arrest. Eckert and Merchant visited Maples on two occasions to discuss the matter and provide him with a complaint form. Merchant requested that Maples' blood sample be tested and, when the result came back negative, had the DUI-drug charge dismissed.

Although Maples did not file a formal complaint until some time in June, an internal affairs (IA) investigation began on May 22. Also on May 22, Johnson initiated an IA investigation into a different matter. He claimed that the Hewitt memo expressing concern about Johnson's performance had been leaked and that local defense attorneys used it to try to discredit his testimony during a driver's license suspension hearing before the Department of Public Safety (DPS hearing) and in a court proceeding.

The two IA investigations were conducted by Sergeant Todd Evans. His role was to find facts, not reach conclusions. As to the Maples arrest, Evans found that the probable cause Johnson documented in his arrest report for believing Maples to be intoxicated consisted of Maples' unsteadiness, bloodshot eyes, slurred speech, and two of the six possible clues on the HGN test due to

-6-

Maples' lack of smooth pursuit. However, in his low breath test result memo, Johnson stated he had obtained four of four HGN clues, and he told Evans during the investigation that he had obtained six of six HGN clues. When Evans pointed out this discrepancy, Johnson maintained that he never records HGN results in his arrest report, preferring to testify from memory so as not to give evidence to the defense. Evans also found that Johnson did not call to see if a drug recognition expert was available, which is required by TPD policy prior to making an arrest for a charge of DUI-drugs.

Based on the conflicts among Johnson's arrest report, his interoffice memo, and his investigation testimony, as well as Johnson's statement about testifying from memory and what Evans described as Johnson's inability to give clear answers and his tendency to change his answers to the same questions over time, Evans became concerned about Johnson's ability to testify accurately in hearings on other arrests. After further investigation, Evans found, among other things, that Johnson gave sworn testimony during a DPS hearing on May 22, 2001, in which he described a portion of the HGN test as holding a pen in front of the suspect's eyes to see if the eyes balanced out. When Evans asked him about this, Johnson reportedly said he had no idea what he meant by his testimony but that "[i]t may not have been incorrect." Aplee. Supp. App. at 75. Evans testified that the procedure Johnson described is not part of any HGN test.

As to Johnson's complaint about the Hewitt memo, Evans found no evidence that it had been leaked. Johnson had maintained that the memo was used against him while he gave sworn testimony during a court hearing on May 9, 2001. Evans found that Johnson was at the courthouse on that particular day for a hearing on whether defense counsel was entitled to internal TPD documents concerning Johnson's DUI arrests. The hearing, however, was rescheduled, and Evans found that no hearing had ever occurred in that case where sworn testimony was given. When confronted with this information, Johnson remained adamant that his recollection was correct.

Johnson also maintained that the Hewitt memo was used against him by a defense attorney during the May 22 DPS hearing referred to above. Johnson claimed he saw the attorney holding a page of statistics from Hewitt's memo that was in Hewitt's handwriting. When Evans told Johnson that his copy of the Hewitt memo contained no handwritten pages, Johnson provided Evans with a copy of a handwritten page from Pierce's report and maintained that it was the page he had seen in the defense attorney's hand at the DPS hearing. Evans, however, found evidence suggesting that the defense attorney had submitted, as exhibits, copies of publicly-available breath-test logs and had created a page of his own handwritten statistics derived from those logs. Evans also found that the statistics the defense attorney recited during the DPS hearing were different than those contained in the Hewitt memo and concerned a different time period.

Sergeant Eckert, Captain McCrory, and Major Merchant reviewed Evans's findings. Each of them recommended termination or a pre-termination hearing based on Johnson's failure to properly build probable cause for the Maples arrest.[4] Eckert categorized Johnson's failure to give all three SFSTs as "deliberate indifference to prior training." *Id.* at 113. Noting this failure as well as Johnson's failure to call for a drug recognition expert, McCrory stated that Johnson had "ignored the training, counseling and retraining he received concerning DUI detection and arrests." *Id.* at 116. Merchant found Johnson's conduct "notable" because the Maples "arrest occurred <u>after</u> Officer Johnson had undergone approximately six months of special attention designed to address this specific area." *Id.* at 134. McCrory and Merchant also recommended finding that Johnson's description of the HGN test during the May 22 DPS hearing not be sustained as an instance of false testimony, although both thought this was further evidence of Johnson's incompetence.

As to the other investigation, Eckert, McCrory, and Merchant deemed Johnson's allegation that the Hewitt memo had been leaked to be unfounded. Eckert and McCrory recommended, therefore, sustaining the charges that Johnson had made a false report and had lied during Evans's investigation of his complaint. Merchant, however, disagreed, reasoning that Johnson had merely

---

[4] Eckert and McCrory made their recommendations to Merchant, and Merchant made his recommendation to Deputy Police Chief Charlie Jackson, who apparently forwarded them to Police Chief Ronald Palmer.

been mistaken that the defense attorneys were in possession of the Hewitt memo. Eckert recommended a fifteen-day unpaid suspension. It does not appear that McCrory or Merchant gave a specific recommendation on discipline or termination arising from this investigation.

After reviewing the recommendations and the IA file and conducting a pre-termination hearing, Police Chief Ronald Palmer discharged Johnson for his conduct in the Maples arrest and for making false or inaccurate statements, specifically, his testimony about the HGN test during the May 22 DPS hearing, his complaint that the Hewitt memo had been leaked, and his testimony during the investigation by Evans into his IA complaint. As to the Maples arrest, Chief Palmer wrote:

> After administering an incomplete and non-standard field sobriety test on Mr. Maples, you subsequently arrested him for DUI-Alcohol. After Mr. Maples' breath test returned a result of 0.00% BAC, you failed to request a certified Drug Recognition Expert, and further found no evidence of legal or illegal drugs on or about Mr. Maples.

*Id.* at 141.

### III. Discussion

We preface our discussion with a clarification of the issues presented in this appeal. The mixed-motive defense applies once a plaintiff establishes a retaliatory motive for an employment decision, and shifts the burden to the defendant to prove by "a preponderance of the evidence that it would have

reached the same decision . . . even in the absence of the protected conduct."

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

In his opening brief on appeal, Johnson frames his first issue as whether there was sufficient evidence to support giving a mixed-motive instruction, including whether the City waived the mixed-motive defense. However, he repeatedly refers to Instruction No. 3 as the instruction relevant to the mixed-motive defense. Instruction No. 3 reads:

### EMPLOYMENT RELATIONSHIP

You are instructed that an employer is entitled to use its judgment as to how to run its business and the law does not generally control the reasons or basis on which an employer may discharge one of its employees. The employer may lawfully discharge an employee for any reason, good or bad, fair or unfair, reasonable or unreasonable unless the discharge was motivated by unlawful discrimination.

You are not to "second guess" the employers [sic] decision or substitute your judgment for that of the employer out of sympathy for the Plaintiff or because you think the decision was bad, unfair or unreasonable.

As applicable to this case, all the law requires is that the employer not terminate the employee because of his race or because he filed a lawsuit against the employer.

Aplt. App., Vol. I at 121. Although Instruction No. 3 potentially bears on the mixed-motive defense, Instruction No. 4, titled "Discrimination in Employment," seems to set forth the defense squarely. In relevant part, that instruction reads:

-11-

> [I]f you find that Defendant's termination of Plaintiff's employment was also motivated by factors other than his race or the filing of a lawsuit against Defendant, you must then decide whether Plaintiff is entitled to money damages. Plaintiff is entitled to money damages unless the greater weight of the evidence demonstrates that the Defendant would have terminated Plaintiff even in the absence of consideration of his race or the filing of a lawsuit against Defendant.

*Id.* at 123.

At trial, Johnson objected to Instruction No. 3 but not to Instruction No. 4. *See id.*, Vol. VI at 774-76, 778-80. In fact, Johnson's counsel argued in favor of giving a mixed-motive instruction. *See id.* at 780 (stating, in response to the City's contention that a pretext instruction was proper instead, "that the jury easily could find that there were mixed motives" and that "I'm not really sure how [the City] claim[s] at this point that there's no room in this case for a finding of mixed motives"). In his post-trial motions, Johnson did not argue that it was improper to give Instruction No. 4. Instead, he argued that the mixed-motive defense was not supported by the evidence and that Instruction No. 3 was improperly given because it failed to account for a collective bargaining agreement (CBA) that governed the parties' employment relationship.

This confusion has obscured the contours of the issues on appeal. In view of the foregoing, we construe the issues as follows: (1) whether the City waived its mixed-motive defense; (2) whether Johnson is entitled to JMOL because there was insufficient evidence to support the jury finding that the City would have

-12-

discharged him even in the absence of a retaliatory motive; and (3) whether Johnson is entitled to a new trial because Instruction No. 3 failed to account for the existence of the CBA.

## A. Waiver of the mixed-motive defense

Johnson argues that the City waived the mixed-motive defense because it was not affirmatively presented in the pretrial order, no witnesses were designated to testify about it, and the City offered no evidence to support it.[5] The City responds that Johnson did not raise this waiver argument in the district court and is therefore barred from raising it on appeal. We agree with the City. We review issues raised for the first time on appeal only "in the most unusual circumstances," such as "where manifest injustice would result." *Smith v. Rogers Galvanizing Co.*, 128 F.3d 1380, 1386 (10th Cir. 1997) (quotations omitted). Nothing in the record shows that Johnson raised waiver in the district court. We see no manifest injustice in declining to review the issue because, as noted above, Johnson's counsel argued in support of an instruction on the mixed-motive defense and, as discussed below, sufficient evidence supported the defense.

---

[5] Johnson also contends that the City waived the mixed-motive defense because it did not request Instruction No. 3. The City's actions with regard to Instruction No. 3 are not germane to the waiver issue because that instruction does not set forth the defense.

**B. Sufficiency of the evidence**

Johnson next argues that the district court erred in denying his motion for JMOL because there was insufficient evidence to support the mixed-motive defense. We review the district court's refusal to grant JMOL de novo, applying the same standard as the district court. *Mason v. Okla. Tpk. Auth.*, 115 F.3d 1442, 1450 (10th Cir. 1997). Under that standard, "we view the record in the light most favorable to the prevailing party and give that party the benefit of all reasonable inferences to be drawn from the evidence." *Webco Indus., Inc.*, 278 F.3d at 1123. "[J]udgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Mason*, 115 F.3d at 1450. It is well established that "[t]he jury . . . has the exclusive function of appraising credibility, determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact." *Thunder Basin Coal Co. v. Sw. Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir. 1997) (quotations omitted).

To prevail in a mixed-motive case, an employer does not need to provide direct evidence that it would have made the same decision even in the absence of an improper motive. *See Foster v. Univ. of Ark.*, 938 F.2d 111, 114 (8th Cir. 1991). Rather, an employer may satisfy its burden on the mixed-motive defense by presenting sufficient objective evidence from which the jury could reasonably

conclude that the employee's job performance was so unsatisfactory that he would have been discharged even in the absence of an improper motive. *See id.*

The City presented evidence that it found Johnson's performance in connection with the Maples arrest to be unsatisfactory and cited what is saw as Johnson's incompetence as a reason for terminating his employment. Although Johnson presented some evidence that the Maples arrest was supported by probable cause, he admits that there was contrary evidence on this point, Aplt. Opening Br. at 24. We do not weigh the evidence or evaluate the credibility of the witnesses. *Mason*, 115 F.3d at 1450. After careful review of the record, we conclude that there was sufficient evidence from which the jury could find that Johnson's performance in the Maples arrest, viewed in context of the specific counseling and training the City had provided to Johnson, was sufficiently unsatisfactory that the City would have terminated his employment even in the absence of a retaliatory motive.

Johnson's specific arguments to the contrary lack merit. First, he asserts that it is undisputed that no TPD officer had ever been terminated for incompetence or for a bad DUI arrest. Even if true, this bald fact does not necessitate a finding that the City's reasons in this case were not mixed. Johnson's entire chain of command emphasized that Johnson had received additional SFST training shortly before the Maples arrest and failed to perform

-15-

appropriate SFSTs on Maples. Thus, this case involved more than simple incompetence or a single bad DUI arrest.

Second, Johnson argues that the percentage of suspects he arrested for DUI that tested below the legal limit was less than the department-wide average.[6] The implication we ostensibly are to draw is that this statistic means the City should not have terminated his employment. However, it was not Johnson's percentage of low breath tests that motivated his discharge, but rather his performance in the Maples arrest viewed in the context of the specific counseling and training he had received. Thus, the jury was free to reach its conclusion despite any statistical comparison favorable to Johnson that the evidence may have supported.

Third, Johnson points to testimony concerning a comparison case in which other officers beat and falsely arrested a suspect outside of their jurisdiction and lied to IA investigators to conceal their conduct. Johnson contends that this conduct was worse than his arrest of Maples yet those officers were only disciplined, not discharged, suggesting that his own discharge was fabricated. However, there was no evidence that those officers had a history of poor performance in an area in which they had just received specific counseling and training, which was the basis for Chief Palmer's opinion that the other case was less serious than Johnson's. Although Merchant testified that the comparison

---

[6] Apparently, this argument concerns Johnson's DUI arrests in 2001, as Pierce's November 2000 report showed his percentage of low breath test results was higher than the department average.

case was worse and warranted discharge, that opinion does not undermine the fact that Merchant also recommended termination based on Johnson's arrest of Maples. That the City did not discharge the other officers, therefore, is an insufficient basis for JMOL in Johnson's favor.

Johnson offers no argument concerning the other non-retaliatory basis for discharge proffered by the City, namely, his false or incorrect testimony. Accordingly, we need not address it.[7]

To the extent Johnson's challenge to the sufficiency of the evidence implicates Instruction No. 4, the mixed-motive instruction, our review is limited to plain error review because he did not object to that instruction in the district court, *see* Fed. R. Civ. P. 51(d)(2). As sufficient evidence supported the defense, we see no plain error.

In sum, we conclude that sufficient evidence supported the jury's finding that the City would have discharged Johnson even in the absence of a retaliatory motive. As discussed below, the fact that there was no evidence of or instruction regarding the CBA did not impermissibly affect that finding.

---

[7] Johnson argues for the first time in his reply brief, and without citation to any legal authority, that the mixed-motive defense fails because the City did not avail itself of any of a number of established methods of carrying its burden of proof. We decline to consider non-jurisdictional arguments raised for the first time in a reply brief, *Sadeghi v. INS*, 40 F.3d 1139, 1143 (10th Cir. 1994), or arguments not supported by any legal authority, *see Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992).

**C. Instruction No. 3**

We now turn to Johnson's final issue. He argues that the district court erred in denying him a new trial because Instruction No. 3 was materially misleading to the extent it "invited the jury to find that [the City] could have terminated [him] for no reason at all" rather than "whether [the City] truly had good cause," ostensibly under the CBA. Aplt. Opening Br. at 28.

> We review the district court's decision to give a particular instruction for abuse of discretion. To determine whether the jury was adequately instructed on the applicable law, we review the instructions in their entirety de novo to determine whether the jury was misled in any way. The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them.

*Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999) (citations omitted).

As an initial matter, we disagree that Instruction No. 3 permitted the jury to find that the City could have terminated Johnson's employment for no reason at all. Instruction No. 3 provides that an "employer may lawfully discharge an employee for *any reason*, good or bad, fair or unfair, reasonable or unreasonable unless the discharge was motivated by unlawful discrimination." Aplt. App., Vol. I at 121 (emphasis added). The instruction informed the jury that it was not to "second guess" the City's decision or substitute its judgment for the City's because it felt that the decision was bad, unfair, or unreasonable. *Id.* That

-18-

instruction, taken together with Instruction No. 6, which advised the jury to evaluate the credibility of the City's explanation, *see id.* at 125, properly informed the jury that part of its task was to determine if the City established a non-retaliatory reason that was not pretextual.[8]  Thus, Johnson's suggestion that the jury could have found in the City's favor if it determined that the City discharged him for a reason "as trivial as [its] dislike of the color of [his] eyes," Aplt. Opening Br. at 28 n.10, has no persuasive value in our evaluation of the propriety of Instruction No. 3.  We are likewise unpersuaded by his suggestion that "[t]he instructions might as well have advised the jury that . . . retaliation was a valid reason for the termination," Aplt. Reply Br. at 13.

Johnson has not directed us to any case law, and we have found none, supporting the propositions implicit in his briefs:  that the CBA was material to the mixed-motive defense or that an employer has the burden to show that it discharged an employee according to the just-cause requirements of a contract or CBA in order to avail itself of the mixed-motive defense.  None of the cases Johnson cites in support of his argument concerns whether contractual just-cause

---

[8]     A pretext instruction in a mixed-motive case appears proper because the issue of mixed motives "'does not arise for the trier of fact until the plaintiff has carried the burden of persuading the trier that the forbidden animus was a motivating factor in the employment decision but has failed to persuade the trier that non-discriminatory reasons proffered by the employer were pretexts and not also motivating factors.'"  *Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) (quoting *Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 181 (2d Cir. 1992)).

provisions are relevant to retaliation or discrimination claims; indeed, those cases did not involve retaliation or discrimination at all, but rather a variety of state-law breach of contract, wrongful termination, and constructive discharge claims.[9]

We are persuaded instead by a case from the Seventh Circuit involving a claim under the Age Discrimination in Employment Act (ADEA):

> Whether a given employee serves at will, or for a term of years, or under a contract requiring "good cause" for discharge, is neither here nor there; violation of a "cause" requirement in a contract of employment does not make a discharge unlawful under the ADEA. Contractual terms could be pertinent to a state-law claim of wrongful termination joined with the federal claim, but Achor did not make such a claim.

*Achor v. Riverside Golf Club*, 117 F.3d 339, 341-42 (7th Cir. 1997). Although we conclude that, in a retaliation case, the existence of a "just cause" requirement in a contract does not necessarily require a jury instruction describing the nature of the employment relationship, a just cause violation could cast doubt on the credibility of an employer's proffered reasons for discharging an employee. If Johnson wanted to question the credibility of the City's proffered reasons in this manner, he should have adduced some evidence that those reasons ran afoul of the CBA. Even though the parties stipulated in the pretrial order that their

---

[9]     *See* Aplt. Opening Br. at 27-28 citing *Alexander v. Nextel Commc'ns, Inc.*, 61 Cal. Rptr. 2d 293 (Ct. App. 1997); *Haycock v. Hughes Aircraft Co.*, 28 Cal. Rptr. 2d 248 (Ct. App. 1994); *Lineberger v. Williams*, 393 S.E.2d 23 (Ga. Ct. App. 1990); *Barks v. Cosgriff Co.*, 529 N.W.2d 749 (Neb. 1995); *Murphy v. Publicker Indus., Inc.*, 516 A.2d 47 (Pa. Super. Ct. 1986); and *Siekawitch v. Wash. Beef Producers, Inc.*, 793 P.2d 994 (Wash. Ct. App. 1990).

employment relationship was governed by a CBA, Johnson presented no evidence of how the "just cause" provision of the CBA applied to his claim. Furthermore, Johnson has not explained on appeal how the non-retaliatory reasons given by the City violated the CBA. Thus, even if the CBA was relevant, a position we reject on the evidence presented in this case, Johnson has not shown prejudice from the failure of the district court to include in a jury instruction whatever "just cause" might exist in the CBA.

Johnson's observation that the City did not request or argue in favor of Instruction No. 3 has little relevance to this issue. A district court has a duty to instruct the jury as to the applicable law based on the pleadings and the evidence. *See Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 19 (10th Cir. 1970). Instruction No. 3 was necessary in order to explain to the jury that any error or mistake of judgment the City might have made in deciding to discharge Johnson was not to be a factor that swayed the jury's finding on the mixed-motive defense. Because no evidence of the CBA was presented, the district court had no obligation to include any heightened "just cause" requirements in its instructions. Even if Johnson had proposed his own jury instruction, which appears unlikely because he has not included his proposed jury instructions in his appendix, the district court likely would have rejected it due to the lack of any supporting evidence. *See id.*

-21-

Based on the foregoing, we conclude that the district court did not abuse its discretion in giving Instruction No. 3.

## V. Conclusion

The judgment of the district court is **AFFIRMED**.

Entered for the Court

Timothy M. Tymkovich
Circuit Judge